1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                   EASTERN DISTRICT OF CALIFORNIA

9

10   TOBY WILSON,                    No.  2:12-cv-00547-JAM-CKD

11              Plaintiff,

12        v.                         **ORDER GRANTING IN PART AND
                                     DENYING IN PART DEFENDANTS'**
13   CITY OF VALLEJO; M. THOMPSON; D. **MOTION FOR SUMMARY JUDGMENT**
     JOSEPH; M. NICOL; J. JAKSCH; B.
14   CLARK; ROBERT NICHELINI; and
     DOES 1-15, inclusive,
15
                Defendants.
16

17        Presently before the Court is Defendants City of Vallejo

18   ("the City"), Robert Nichelini, M. Thompson, D. Joseph, M. Nicol,

19   J. Jaksch, and B. Clark's (collectively "Defendants") Motion for

20   Summary Judgment pursuant to Federal Rule of Civil Procedure 56

21   (Doc. #17).[1]  Plaintiff Toby Wilson ("Plaintiff") failed to file

22   a timely opposition and his request for a 30-day extension of

23   time was denied (Doc. ##25, 28).

24              I.   FACTUAL AND PROCEDURAL BACKGROUND

25        This action arises from Plaintiff's allegations that

26   _____

27   [1] This motion was determined to be suitable for decision without
     oral argument. E.D. Cal. L.R. 230(g).  The hearing was originally
28   scheduled for August 21, 2013.

                                    1

Defendants deprived him of his constitutional rights in violation of 42 U.S.C. § 1983.  Plaintiff also brought state law claims against individual Defendant Officers M. Thompson, D. Joseph, M. Nichol, J. Jaksch, and B. Clark ("Defendant Officers").  Comp. at pp. 6-7.  Plaintiff's claims all arise out of events that occurred on July 17, 2010.  Complaint ¶¶ 8-9.

On July 17, 2010, Plaintiff resided at Redwood Garden Apartments in Vallejo, California ("Redwood").  Statement of Undisputed Facts (Doc. #19) Fact 1.  At some point in the afternoon, Plaintiff became involved in a dispute with his neighbor on the second floor balcony between their apartments.  SUF 6, 8.  Plaintiff's balcony overlooked a courtyard in the middle of the Redwood complex where, on the date of the incident, residents were barbequing and swimming.  SUF 2-3, 37.  Plaintiff's girlfriend arrived and convinced Plaintiff to go back into his apartment.  SUF 9.  However, shortly thereafter, Plaintiff went back out onto the balcony, this time without his shirt.  SUF 9-10.  Plaintiff testified that as soon as he went back onto the balcony, he heard someone say, "He's got a gun."  SUF 10.

The Redwood manager received calls from a maintenance man and another resident informing her that Plaintiff was on his balcony with a gun.  SUF 4, 12-13.  After identifying Plaintiff on his balcony, but without observing a gun, the manager called 9-1-1 and told the dispatcher that there was a tenant with a gun on her property.  SUF 14-16.  The manager informed the dispatcher that there were residents outside playing with their children.  SUF 2-3, 18.

1     Plaintiff originally indicated in the Complaint that

2   although officers saw him and requested that he come down, he

3   instead went back inside his apartment, locked the door, and went

4   to sleep.  Comp. ¶ 8.  However, in his deposition, Plaintiff

5   indicated that he did not see any officers arrive before he went

6   back inside his apartment and fell asleep in a back bedroom.  SUF

7   19-21.

8     Officers arrived in full uniform and ordered people in the

9   courtyard to get down or into their houses, and the residents

10  scattered.  SUF 23-25.  Officers asked dispatch for a contact

11  telephone number for Plaintiff's apartment, but one was not

12  available.  SUF 26.  When officers pointed at Plaintiff's

13  apartment door, Ms. Turner told them "Yes, yes, that's him."  SUF

14  27.  Officers organized a perimeter while their supervisor,

15  Sergeant Brett Clark, gathered additional information on how to

16  respond to the threat.  SUF 29.  Sergeant Clark spoke to

17  witnesses who "said they saw the suspect at that location . . .

18  with a gun, arguing with somebody at that particular apartment."

19  SUF 30.  Additionally, "multiple people [were] calling the police

20  department" reporting a resident "armed with a firearm."  SUF 31.

21  Witnesses told Sergeant Clark that the armed man went back into

22  his apartment.  Cavanaugh Decl. Exh. H - Clark Depo. (Doc. #21-8)

23  36:5-8.

24    Officers learned that Plaintiff had a prior felony

25  conviction.  SUF 33.  Sergeant Clark testified that the

26  circumstances and the felony conviction indicated to him that

27  Plaintiff was "a violent individual" who had barricaded himself

28  inside his home.  SUF 34-36.  He determined that Plaintiff should

1  be taken into custody.  He testified:

> Once we [had] established a relationship with the
> people inside the apartment complex we had an
> obligation, given the totality of the circumstances, a
> man with a weapon, potential for violence, the way the
> apartment complex is set up, you know – his apartment
> was looking out over a courtyard.  You know, if he had
> a weapon, you know, he could have fired on innocent
> people.

SUF 37.

Sergeant Clark placed Corporal M. Nicol, an officer with SWAT experience, in charge of an entry team.  SUF 38.  Other members of the team included Sergeant Iacano, Officer Kent Tribble, Officer Shane Bower, Officer Dustin Joseph, and Officer M. Thompson and his K-9, Yago.  SUF 39.

At approximately 8:00 p.m., the officers ordered Plaintiff to surrender from in front of his apartment; the manager witnessed the police "hollering, 'Police. Come out with your hands up.'"  SUF 40-41.  A 37 mm rubber round was fired through a rear window.  SUF 43.  Officers shouted commands to Plaintiff from outside his apartment, but Plaintiff did not respond to the shouts or the window being shot out.  SUF 44-45.  Officers then shot a 37 mm round through the window to the right of the front door.  SUF 48.  Officer Joseph deployed a flash bang grenade through the broken front window with the purpose of causing a distraction, and, at approximately 8:20 p.m., officers entered the apartment.  SUF 47, 49.  Officers then announced, multiple times, that they "would send in a K-9 to search" and that the dog "could possibly bite;" Plaintiff did not respond.  SUF 51-52. Officers Thompson and Yago entered and searched the front portion of the apartment.  SUF 53-54.  The dog was then removed.  SUF 55.

4

A second flash bang grenade was deployed at the end of the hallway near the back bedrooms.  SUF 57.  Officers moved deeper into the apartment where they observed Plaintiff lying on a bed in a back room.  SUF 58.  Officers testified that Plaintiff was lying face down with his arms covered by a sheet.  SUF 58-59.  Officer Joseph ordered Plaintiff to show his hands, but Plaintiff did not respond.  SUF 60.  At approximately 8:23 p.m., Officer Joseph deployed his taser, although he is unsure of whether he hit Plaintiff.  SUF 62.  Officer Thompson made one last dog announcement before releasing the dog.  SUF 63-64.  The dog bit into Plaintiff and held onto him.  SUF 64.

Plaintiff testified that once he laid down in bed he "blacked out" and did not hear anything or know that officers were in his apartment until he was awoken by the dog bite.  SUF 72-74.  He testified that he was only wearing boxers when he laid down and was lying on top of the sheet and blanket, which were on the bed.  Cavanaugh Decl. Exh. A – Wilson Depo. (Doc. #21-1) 68:5-69:4.  Plaintiff testified that he remembers he was lying on his back because the dog bit him in the stomach.  Id.

Plaintiff began hitting the dog.  SUF 65, 74.  Officer Thompson told Wilson to stop striking the dog while Officer Joseph was yelling "stop resisting."  SUF 66-67.  Officer Joseph grabbed Plaintiff's arm and punched him in the face, stunning Plaintiff.  SUF 67-68.  Officer Thompson put Plaintiff's right hand into a control hold and moved it into a bent wrist hold allowing the other officers to handcuff Plaintiff.  SUF 69, 71.  Corporal Nicol discharged his taser hitting Plaintiff.  SUF 70.  The taser wires broke off at some point after the tasing.  SUF

1  70.

2      Plaintiff testified that he didn't realize who the officers

3  were until "they just like choked" him.  SUF 74.  He testified

4  that the officers tased him, and when he pulled it out of

5  himself, they tased him two more times.  SUF 74.

6      The estimated total time from the initial 9-1-1 call to

7  Plaintiff's arrest was 57 minutes.  SUF 75.  Police Chief Robert

8  Nichelini was not present at the scene of the events of this

9  case.  SUF 80.

10      Emergency vehicles transported Plaintiff to a hospital for

11  medical treatment.  SUF 76.  Plaintiff had visible lacerations

12  from the dog bite and was admitted to the hospital where he

13  remained for "about three days."  SUF 76.

14      Plaintiff filed his complaint in February 2012 asserting

15  five causes of action.  Defendants brought a Motion for Judgment

16  on the Pleadings (Doc. #15), which was granted in part.  Order on

17  Def. Motion for Judgment on the Pleadings (Doc.#30).  That order

18  disposed of the claim against the City of Vallejo (Second Cause

19  of Action) and any claims against Defendant Officers in their

20  official capacities.

21

22                    II.   OPINION

23      A.   Legal Standard

24      The Federal Rules of Civil Procedure provide that "a court

25  shall grant summary judgment if the movant shows there is no

26  genuine issue of material fact and that the movant is entitled to

27  judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party

28  asserting that a fact cannot be disputed must support the

1    assertion by citing to particular parts in the record, or by

2    showing that the materials cited do not establish the presence of

3    a genuine dispute.  Fed. R. Civ. P. 56(c)(1)(A)-(B).  The purpose

4    of summary judgment "is to isolate and dispose of factually

5    unsupported claims or defenses."  Celotex Corp. v. Catrett, 477

6    U.S. 317, 323-24 (1986).

7        The moving party bears the initial responsibility of

8    informing the district court of the basis for its motion, and

9    identifying those portions of "the pleadings, depositions,

10   answers to interrogatories, and admissions on file, together with

11   the affidavits, if any," which it believes demonstrate the

12   absence of a genuine issue of material fact.  Celotex Corp., 477

13   U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).  That burden may be

14   met by "'showing'- that is, pointing out to the district court-

15   that there is an absence of evidence to support the non moving

16   party's case."  Fairbank v. Wunderman Cato Johnson, 212 F.3d 528,

17   531 (9th Cir. 2000) (quoting Celotex Corp., 477 U.S. at 325).  If

18   the moving party meets its burden with a properly supported

19   motion, the burden shifts to the opposing party.  Id.  The

20   opposition "may not rest upon the mere allegations or denials of

21   the adverse party's pleading," but must provide affidavits or

22   other sources of evidence that "set forth specific facts showing

23   that there is a genuine issue for trial."  Devereaux v. Abbey,

24   263 F.3d 1070, 1076 (9th Cir. 2001)(quoting Fed. R. Civ. P.

25   56(e)).  The adverse party must show that the fact in contention

26   is material and the issue is genuine.  Anderson v. Liberty Lobby,

27   Inc., 477 U.S. 242, 248 (1986).  A "material" fact is a fact that

28   might affect the outcome of the suit under governing law.  Id.  A

7

fact issue is "genuine" when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Villiarmo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).  However, uncorroborated and self-serving testimony alone does not create a genuine issue of fact.  Id.  The Court must view the facts and draw inferences in the manner most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient: "There must be evidence on which the jury could reasonably find for [the non-moving party]." Anderson, 477 U.S. at 252.  This Court thus applies to either a defendant's or plaintiff's motion for summary judgment the same standard as for a motion for directed verdict, which is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id.

Here, the Motion for Summary Judgment is unopposed.  A district court may not grant a motion for summary judgment solely because the opposing party has failed to file an opposition. Cristobal v. Siegel, 26 F.3d 1488, 1494-95 & n. 4 (9th Cir. 1994) (unopposed motion may be granted only after court determines that there are no material issues of fact).  The court may, however, grant an unopposed motion for summary judgment if the movant's papers are themselves sufficient to support the motion and do not on their face reveal a genuine issue of material fact.  Henry v. Gill Industries, Inc., 983 F.2d 943, 950 (9th Cir. 1993).

1          B.   Chief Robert Nichelini

2          As stated, Plaintiff's claims against Chief Nichelini in his

3    official capacity have already been dismissed by this Court.   In

4    their Motion for Summary Judgment, Defendants seek to dismiss all

5    claims asserted against Chief Nichelini.   MSJ at p. 20.   Although

6    it is unclear from the face of the Complaint exactly what claims

7    are being made against Chief Nichelini, for the purposes of this

8    motion, the Court will consider Plaintiff's second cause of

9    action as stating a claim against Chief Nichelini in his

10   individual, supervisorial capacity.   Supervisors can be held

11   liable for:

12        "1) their own culpable action or inaction in the training,
          supervision, or control of subordinates; 2) their
13        acquiescence in the constitutional deprivation of which a
          complaint is made; or 3) for conduct that showed a reckless
14        or callous indifference to the rights of others."

15   Edgerly v. City & Cnty. of San Francisco, 599 F.3d 946, 961 (9th

16   Cir. 2010) (quoting Cunningham v. Gates, 229 F.3d 1271, 1292 (9th

17   Cir. 2000).   The Ninth Circuit has found supervisorial liability

18   pursuant to § 1983 where the defendant "'was personally involved

19   in the constitutional deprivation or a sufficient causal

20   connection exists between the supervisor's unlawful conduct and

21   the constitutional violation.'"   Id. (quoting Lolli v. County of

22   Orange, 351 F.3d 410, 418 (9th Cir. 2003).

23        There is no evidence before the Court of any personal

24   involvement by Chief Nichelini in the conduct underlying

25   Plaintiff's claims.   In fact, Plaintiff has submitted no evidence

26   regarding any action or inaction on the part of Chief Nichelini.

27   To the extent that Plaintiff is attempting to hold him

28   responsible in a supervisorial capacity, Plaintiff's allegations

                                    9

1   and supporting evidence are insufficient to support such claims.

2   See Edgerly, 599 F.3d at 961-62; Brasure v. Ayers, C 08-01943 JF

3   (PR), 2008 WL 2949276, at *1 (N.D. Cal. 2008); Crane v. Evans,

4   C 08-4454 JF (PR), 2008 WL 5102461, at *1 (N.D. Cal. 2008).

5   Accordingly, the Court dismisses any remaining claims against

6   Chief Nichelini.

7      C.   First Cause of Action: Violation of § 1983

8      In the Complaint, Plaintiff alleges that Defendant Officers

9   acted under color of law to deprive Plaintiff of certain

10  constitutionally protected rights, including the rights (1) to

11  not be deprived of liberty without due process of law, (2) to be

12  free from the use of excessive force, and (3) to be free from

13  unlawful seizure.  Comp. ¶ 13.  Defendants contend the undisputed

14  facts establish that Defendant Officers did not violate

15  Plaintiff's constitutional rights.

16         1.   Warrantless Entry and Arrest

17     Defendants argue the claims asserting deprivation of liberty

18  without due process and unlawful seizure fail because (1) the

19  Officers warrantless entry into Plaintiff's home was reasonable

20  based on the exigencies of the situation; and (2) the arrest of

21  Plaintiff was supported by probable cause.  MSJ at pp. 9-10.

22         a.   Warrantless Entry

23     Even when officers have probable cause to arrest a suspect,

24  seizures inside a home without a warrant are presumptively

25  unreasonable under the Fourth Amendment.  Groh v. Ramirez, 540

26  U.S. 551, 559 (2004).  "Nevertheless, because the ultimate

27  touchstone of the Fourth Amendment is 'reasonableness,' the

28  warrant requirement is subject to certain exceptions."  Brigham

1   <u>City, Utah v. Stuart</u>, 547 U.S. 398, 403 (2006).  One such

2   exception exists where the exigencies of the situation facing

3   officers makes the needs of law enforcement so compelling that

4   the warrantless entry and seizure is objectively reasonable under

5   the Fourth Amendment.  <u>Id.</u>  "Exigent circumstances are defined to

6   include 'those circumstances that would cause a reasonable person

7   to believe that entry . . . was necessary to prevent physical

8   harm to the officers or other persons, the destruction of

9   relevant evidence, the escape of the suspect, or some other

10  consequence improperly frustrating legitimate law enforcement

11  efforts.'"  <u>Fisher v. City of San Jose</u>, 558 F.3d 1069, 1075 (9th

12  Cir. 2009) (quoting <u>United States v. Lindsey</u>, 877 F.2d 777, 780

13  (9th Cir. 1989)).

14       Here, Defendant Officers were faced with a suspect whom they

15  had cause to believe was armed.  Witnesses told Defendant

16  Officers that Plaintiff was carrying a gun and had just retreated

17  back into his apartment shortly before they arrived.  Plaintiff's

18  apartment looked directly over a courtyard where innocent people

19  could be targeted and in a building with many children.  After

20  announcing their presence multiple times and demanding that

21  Plaintiff open his door to no avail, they entered his apartment

22  to affect his arrest.

23       The Supreme Court recently reiterated that "reasonableness

24  'must be judged from the perspective of a reasonable officer on

25  the scene, rather than with the 20/20 vision of hindsight' and

26  that '[t]he calculus of reasonableness must embody allowance for

27  the fact that police officers are often forced to make split-

28  second judgments—in circumstances that are tense, uncertain, and

11

1   rapidly evolving.'" <u>Ryburn v. Huff</u>, ––– U.S. ––––, 132 S.Ct. 987,

2   991-92 (2012) (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 396-397

3   (1989)).  The Court finds that exigent circumstances existed at

4   the time of the Defendant Officers' warrantless entry into

5   Plaintiff's apartment and their decision to enter was objectively

6   reasonable under those circumstances.  No violation of

7   Plaintiff's Fourth Amendment rights occurred as a result.  <u>See</u>

8   <u>Fisher</u>, 558 F.3d at 1077; <u>Pryor v. City of Clearlake</u>, 877 F.

9   Supp. 2d 929, 945 (N.D. Cal. 2012).

10      Defendants further argue that even if the warrantless entry

11  were a violation, the Defendant Officers are entitled to

12  qualified immunity because the circumstances would lead a

13  reasonable officer to believe that the entry was permissible

14  under the Fourth Amendment.  Because the Court finds the entry

15  was not a violation of Plaintiff's constitutional rights, any

16  further qualified immunity analysis is unnecessary.  <u>See</u> <u>Jackson</u>

17  <u>v. City of Bremerton</u>, 268 F.3d 646, 651 (9th Cir. 2001)

18      Accordingly, the Court grants Defendants' Motion for Summary

19  Judgment as to those claims arising from Defendant Officers'

20  warrantless entry into Plaintiff's home and their subsequent

21  arrest of Plaintiff.

22                    b.  <u>Arrest</u>

23      The Fourth Amendment requires that an arrest be supported by

24  probable cause.  <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 354

25  (2001).  An arrest is supported by probable cause if, under the

26  totality of the circumstances known to the arresting officer, a

27  prudent person would have concluded that there was a fair

28  probability that a criminal offense had been or was being

committed.  Devenpeck v. Alford, 543 U.S. 146, 152 (2004); see also Luchtel v. Hagemann, 623 F.3d 975, 980 (9th Cir. 2010); Ramirez v. City of Buena Park, 560 F.3d 1012, 1023 (9th Cir. 2009).  "The inquiry is not whether the suspect actually committed the offense, but rather whether a reasonable officer, based on information known to him/her at the time, had probable cause to think that the suspect could have committed the offense."  Cannon v. City of Petaluma, C 11-0651 PJH, 2012 WL 1183732, *8 (N.D. Cal. 2012); see also Blankenhorn v. City of Orange, 485 F.3d 463, 475 (9th Cir. 2007).

Here, Defendant Officers responded to reports that an armed man was arguing with neighbors.  Upon arriving, the reports were corroborated by a number of witnesses.  Defendant Officers then learned that Plaintiff had a previous felony conviction.  Under California law, it is a felony for any person who has been previously convicted of a felony to possess any firearm.  Cal. Penal Code § 29800 (a)(1) (continuing former § 12021(a) without substantive change).  The Court finds that based on the information known to the Officers at the time of the arrest, a reasonable person would have concluded that there was a fair probability that a criminal offense had been committed.  See Devenpeck, 543 U.S. at 152.  Therefore, Defendant Officers' arrest of Plaintiff was supported by probable cause.

## 2.   Excessive Force

Defendants contend the force used in affecting Plaintiff's arrest was reasonably necessary under the circumstances.  They argue Plaintiff's constitutional excessive force claim should therefore be dismissed.

13

1        In Graham, the Supreme Court held that claims of excessive

2   force in the context of arrests should be analyzed under the

3   Fourth Amendment's "objective reasonableness standard," not under

4   substantive due process principles.  490 U.S. at 388, 394-95.

5   Pursuant to that standard, "the question is whether the officers'

6   actions are 'objectively reasonable' in light of the facts and

7   circumstances confronting them without regard to their underlying

8   intent or motivation."  Id. at 397.  Because "police officers are

9   often forced to make split-second judgments-in circumstances that

10  are tense, uncertain, and rapidly evolving-about the amount of

11  force that is necessary in a particular situation," the

12  reasonableness of the officer's belief as to the appropriate

13  level of force should be judged from that on-scene perspective.

14  Id. at 396-97.

15       Assessing the reasonableness of force under the Fourth

16  Amendment ultimately requires a balancing of the intrusion on the

17  individual's Fourth Amendment interests against the

18  countervailing governmental interests at stake.  Graham, 490 U.S.

19  at 396-97.  When determining the governmental interests at stake,

20  courts must pay "careful attention to the facts and circumstances

21  of each particular case, including the severity of the crime at

22  issue, whether the suspect poses an immediate threat to the

23  safety of the officers or others, and whether he is actively

24  resisting arrest or attempting to evade arrest by flight."  Id.

25  at 396.  In addition, "[i]n evaluating the nature and quality of

26  the intrusion, [a court] must consider the type and amount of

27  force inflicted" upon a plaintiff by officers during the arrest.

28  Jackson, 268 F.3d at 651-52 (internal quotation omitted).

1   If the evidence, reviewed in the light most favorable to

2   Plaintiff, could support a finding of excessive force, then

3   Defendants are not entitled to summary judgment.  Smith v. City

4   of Hemet, 394 F.3d 689, 701 (9th Cir. 2005).

5              a.   Governmental Interests

6                   i.   Severity of the Crime

7   The crime at issue, felon in possession of a firearm, is a

8   felony and therefore a serious crime.  Cal. Penal Code § 29800

9   (a)(1); see also Miller v. Clark County, 340 F.3d 959, 964 (9th

10  Cir. 2003) (a felony "is by definition a crime deemed serious by

11  the state").  On the other hand, it did not involve violence or

12  force and is not a crime considered a "serious felony" under

13  state law.  People v. Prieto, 30 Cal. 4th 226, 276 (2003).  In

14  addition, the Ninth Circuit has noted the distinction between

15  felonies and misdemeanors is often minor and arbitrary, and

16  assumptions that one suspected of committing a felony is more

17  dangerous than one suspected of a misdemeanor is untenable.  Chew

18  v. Gates, 27 F.3d 1432, 1442.  It should also be noted that there

19  is no evidence a gun was found in Plaintiff's possession or that

20  he was charged with the crime.  The Court does not find this

21  factor weighs heavily in favor of either party.

22                  ii.   Threat Posed by Plaintiff

23  As discussed above, the evidence indicates that upon

24  arriving on the scene Plaintiff was believed to have been armed,

25  was arguing with neighbors, and had only recently retreated into

26  his apartment.  The apartment complex was situated in such a way

27  that Plaintiff had clear access to a courtyard where other

28  residents congregated.  Thus, there was a substantial

15

governmental interest in ensuring the safety of the officers, Plaintiff, and the other residents that necessitated the initial entry and cautious approach by Defendant Officers.  However, there remains an issue of fact as to what threat Plaintiff posed when Defendant Officers first encountered him and before any force was applied to Plaintiff's person.  Defendant Officers testified that when they first saw Plaintiff he was lying underneath the sheets and on his stomach.  They contend this presented the fear that Plaintiff was lying in wait and could harm the officers if they tried to approach him directly.  In contrast, Plaintiff's testimony indicates that he was stripped down to his boxers and was lying on top of the sheet on his back. Whether Plaintiff could have been concealing a weapon is a major issue in assessing the level of threat Plaintiff posed. Therefore, the dispute of exactly how the officers found Plaintiff is material to that determination and a genuine issue still remains.

In addition, the threat posed by Plaintiff must be assessed with regard at each stage of the force applied.  For example, the threat posed by Plaintiff before they could assess what was happening inside the apartment was certainly higher than after they had applied a control hold or handcuffed Plaintiff.  There remain genuine issues as to what threat was initially posed by Plaintiff and what new threat his resistance to the dog created, but the factor weighs against the reasonableness of the force applied after Plaintiff was found without a gun and certainly after he had already been placed into a control hold by Defendant Officers.

### iii. Active Resistance to Arrest

Plaintiff did not attempt to evade arrest by flight. Plaintiff did fail to respond to Defendant Officers' commands and therefore may have been passively resisting arrest to a certain extent. However, Defendants' testimony concedes that Plaintiff was simply lying on his bed when the group of officers first confronted him. It may be inferred that Plaintiff was willfully avoiding the officers' commands from the sheer volume of their entry into the apartment and their proximity when the final warnings were given, but Plaintiff testified that he was "blacked out," did not hear anything, and was not even aware officers were present until shortly after he woke up. There is also evidence that Plaintiff was attempting to fight the dog off when he awoke, however the exact details of his resistance is unknown. Taken together, there remains a genuine issue as to the nature of Plaintiff's resistance to his arrest.

### b.   Intrusion on Fourth Amendment Interests

Next, the Court must evaluate the intrusion on Plaintiff's Fourth Amendment rights, including the type and amount of force inflicted by Defendant Officers. See Jackson, 268 F.3d at 651-52. After giving several verbal warnings, the evidence indicates that the first force applied was Officer Joseph's deployment of a taser, although it is unclear whether it even made contact with Plaintiff. Next, instead of approaching Plaintiff directly, Officer Thompson released his dog, resulting in the dog biting into Plaintiff's stomach. Plaintiff testified that he was blacked out until this point and, amid his confusion and pain, started to resist the dog's efforts. Officer Joseph then grabbed

17

1   Plaintiff's arm and punched him in the face.  Next, Officer

2   Thompson came forward and placed Plaintiff into a control hold,

3   all while the dog maintained its hold on Plaintiff.  Defendant

4   Officers were then able to quickly handcuff Plaintiff.

5       Defendants' evidence indicates that during this encounter,

6   Corporal Nicol deployed his taser, striking Plaintiff, but to

7   unknown effect.  It is also unclear whether the tasering occurred

8   before or after Officer Thompson placed Plaintiff into the

9   control hold or whether Defendant Officers had already

10  successfully handcuffed Plaintiff.  In addition to this

11  uncertainty, Plaintiff's testimony indicates a slightly different

12  sequence of events following the dog initially biting him.  He

13  testified that he remembers officers choking him and then tasing

14  him three times after the dog bit him, rather than only once as

15  Defendants contend.  As a result of the force used by Defendant

16  Officers, it is undisputed that Plaintiff was hospitalized for

17  three days, suffering visible lacerations.

18      Courts have held that use of police dogs and tasers

19  constitutes a significant use of force.  Smith, 394 F.3d at 701-

20  04; Bryan v. MacPherson, 630 F.3d 805, 832 (9th Cir. 2010).

21  However, there remain genuine issues of exactly how much force

22  was applied in the course of Plaintiff's arrest.

23                  c.   Balancing Test

24      It has been "repeatedly held that the reasonableness of

25  force used is ordinarily a question of fact for the jury."

26  Liston v. Cnty. Of Riverside, 120 F.3d 965, 976 n.10 (9th Cir.

27  1997); see also Jackson, 268 F.3d at 651 & n.1 ("the test for

28  reasonableness is often a question for the jury").  Because the

1  Fourth Amendment balancing of reasonableness "nearly always

2  requires a jury to sift through disputed factual contentions, and

3  to draw inferences therefrom, [the Ninth Circuit has] held on

4  many occasions that summary judgment . . . in excessive force

5  cases should be granted sparingly."  Santos v. Gates, 287 F.3d

6  846, 853 (9th Cir. 2002).

7       Disputes of material fact still exist that bear directly on

8  most of the factors to be weighed in the assessment of whether

9  the force used by Defendant Officers was objectively reasonable.

10  The Court finds that a reasonable fact-finder could conclude,

11  taking the evidence in the light most favorable to Plaintiff,

12  that Defendant Officers' use of force was objectively

13  unreasonable and therefore constitutionally excessive.  See Bryan

14  v. MacPherson, 630 F.3d 805, 832 (9th Cir. 2010); Mattos v.

15  Agarano, 661 F.3d 433, 446 (9th Cir. 2011)  Therefore, summary

16  judgment in favor of Defendants' is inappropriate at this time,

17  and the issue is best left for the jury.  Accordingly, the Court

18  hereby denies Defendants' motion as to the excessive force claim.

19       D.   State Law Claims

20       Defendants argue that because Plaintiff's § 1983 claims must

21  fail, his state law claims must fail as well.  Because the Court

22  has found that the excessive force claim withstands the motion

23  for summary judgment, Plaintiff's state law claims in the third,

24  fourth and fifth causes of action remain viable.  Accordingly,

25  the Court denies summary judgment as to those causes of action.

26

27                         III. ORDER

28       Defendants' Motion for Summary Judgment is granted as to any

                              19

1  remaining claims against Chief Nichelini.

2        Defendants' motion is granted as to any claims arising from

3  Defendant Officers' warrantless entry into Plaintiff's apartment

4  and their seizure of Plaintiff.

5        The motion is denied as to Plaintiff's excessive force claim

6  and his state law claims in the third, fourth and fifth causes of

7  action.

8        IT IS SO ORDERED.

9  Dated: September 5, 2013

                                                _____
10                                               JOHN A. MENDEZ,
                                                 UNITED STATES DISTRICT JUDGE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        20